OPINION
{¶ 1} Defendant-appellant, Edward C. Carter, appeals from a judgment of the Franklin County Court of Common Pleas denying his postconviction application for DNA testing pursuant to R.C. 2953.71 et seq. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} In June 1986, the Franklin County Grand Jury indicted defendant on one count of robbery, one count of kidnapping, and two counts of rape, one of which involved *Page 2 
vaginal intercourse and the other fellatio. Defendant pled not guilty and the case proceeded to trial.
 {¶ 3} The state's evidence at trial, which included the testimony of the victim, indicated as follows. The victim was acquainted with defendant, who was a nephew of her former boyfriend, Lorenzo Logan. She had known defendant for three years prior to the trial. Just after midnight on June 20, 1986, defendant telephoned the victim and asked her to pick him up along with Lorenzo and a third person, who was later identified as William Walker, because they were stranded on High Street with no transportation. The victim agreed to pick them up. She drove her automobile to the location, but when she arrived only defendant was there waiting. Defendant told her that the other two were in a house around the corner, and she proceeded to park outside that house. Defendant encouraged her to go inside, but she declined. Defendant reached over and took the key out of the ignition and then went into the house. The victim followed him into the house. They stayed inside the house for approximately 30 minutes and then left with Lorenzo and William. Defendant insisted on driving the vehicle over the victim's objection. William forced the victim into the back seat with Lorenzo. Defendant started driving at a high rate of speed and merged onto Interstate 71 at Fifth Avenue.
 {¶ 4} They traveled north on I-71 until the vehicle started to smoke and the engine cut off. Defendant guided the vehicle to the side of the freeway. After the vehicle stopped, the three men forcibly took the victim's clothing off her, and proceeded to repeatedly rape her. The victim testified that William vaginally raped her, and then after "[he] got finished," defendant vaginally raped her. (Tr. 31.) After defendant raped her, he left the scene. The victim specifically testified that "after Edward got finished," Lorenzo *Page 3 
also vaginally raped her. (Tr. 32.) She also testified that "Lorenzo, he didn't come inside of [her]. He came on [her] stomach. Then Lorenzo got finished." (Tr. 33.) After Lorenzo stopped raping her, William "came back in the back seat, and he started having intercourse with [her] again." Id. The victim also testified that Lorenzo repeatedly tried to force her to have oral sex with him.
 {¶ 5} At some point, a police cruiser pulled up behind the victim's vehicle. The victim ran to the police officer and told him that she had been raped and informed the officer that she knew the assailants. Lorenzo and William ran away. Shortly thereafter, based on the information that was given to the police, defendant was apprehended and returned to the scene, and the victim identified him as one of the rapists. The victim was taken to St. Anthony Hospital where she was examined. A sample was taken from her vaginal area during a pelvic examination. Examination of the sample revealed the presence of sperm, which, according to the criminalist's testimony, can remain intact in the vagina up to 36 hours after sexual activity. The victim testified that she last had voluntary sex approximately six days before the rapes. As of the time of trial, Lorenzo had been apprehended and was in jail, and there was a warrant out for the arrest of William.
 {¶ 6} Defendant testified in his own defense and denied being involved in the rapes. However, he did admit to lying to the police as to having seen, and been with, the victim that evening. He testified that, when the vehicle broke down, he looked under the hood of the vehicle. After looking at the engine, and determining that it was out of oil, he told the other three that he was going to purchase oil for the vehicle. He left the scene, *Page 4 
and on his way back, he was stopped and arrested by the police. He testified that he first learned that the victim had been raped after he was apprehended by the police.
 {¶ 7} At the conclusion of the trial, the jury found defendant guilty as charged in the indictment. In State v. Carter (Feb. 2, 1988), Franklin App. No. 86AP-884, this court affirmed defendant's convictions for robbery, kidnapping, and one count of rape. As to the other count of rape, that involving fellatio, this court agreed with defendant's argument that there was insufficient evidence admitted at trial to permit a finding beyond a reasonable doubt that the crime of rape by fellatio was actually completed, even though the evidence was clear that it was repeatedly attempted. See id. Consequently, this court reduced the conviction of rape by fellatio to the lesser-included offense of attempted rape by fellatio, and remanded the matter for resentencing. See id. Defendant was resentenced on September 17, 1990.
 {¶ 8} In July 2004, defendant filed an application for postconviction DNA testing under R.C. 2953.72. The state filed a memorandum contra stating that the collected biological material no longer exists. In November 2006, defendant filed a notice of additional authority in support of his application for DNA testing, in which he cited this court's decision in State v. Collier, Franklin App. No. 05AP-716,2006-Ohio-2605. In February 2007, the state supplemented its earlier response to defendant's application by submitting affidavits describing the unsuccessful search for biological material collected in connection with this case. On March 19, 2007, the trial court filed a decision and entry denying defendant's application for DNA testing. The only reason given in the entry for the denial of the application is that the state filed a memorandum contra the application for DNA testing stating that the property no longer exists for this case. *Page 5 
 {¶ 9} Defendant appeals and raises the following single assignment of error for our review:
 The trial court erred in dismissing Mr. Carter's application for DNA testing because the State did not conduct a search for remaining biological material with the "reasonable diligence" required by R.C. 2953.75.
 {¶ 10} By his assignment of error, defendant generally argues that the trial court erred in denying his application for DNA testing. R.C.2953.71 et. seq. governs postconviction DNA testing for eligible inmates whose DNA evidence was not, or could not be, tested in the original felony trial. R.C. 2953.72; Collier, supra. The statutory scheme outlines certain factors that must be satisfied before a trial court "may accept" an application for DNA testing by an eligible inmate. See R.C. 2953.74(B) and (C). It also provides a procedural mechanism for determining whether any biological material was collected in connection with a case, which could have been prosecuted decades ago, and whether that biological material still exists. See R.C. 2953.75.
 {¶ 11} Under R.C. 2953.75(A), when an eligible inmate submits an application for DNA testing, the court shall require the prosecuting attorney to use "reasonable diligence" to determine whether biological material was collected from the crime scene or victim, and whether the parent sample of that biological material still exists at that point in time. For purposes of R.C. 2953.71 to 2953.83, "reasonable diligence" is defined as "a degree of diligence that is comparable to the diligence a reasonable person would employ in searching for information regarding an important matter in the person's own life." R.C. 2953.71(Q). Furthermore, in using reasonable diligence to make those determinations, the prosecuting attorney must investigate all relevant sources, including: (1) all *Page 6 
prosecuting authorities from the original case, (2) all law enforcement authorities involved in the original investigation, (3) all custodial agencies involved at any time with the biological material, (4) the custodian of all agencies involved at any time with the biological material, (5) all crime laboratories involved at any time with the biological material, and (6) all other reasonable resources. See R.C.2953.75(A)(1)-(6). Ultimately, what constitutes reasonable diligence will depend on the facts and circumstances of each particular case. SeeState v. Ustaszewski, Lucas App. No. L-05-1226, 2006-Ohio-329, at ¶ 23.
 {¶ 12} In this case, there is no disagreement that biological material was collected from the victim. Testimony at defendant's trial indicated that a sample was obtained from the victim at the hospital in connection with a pelvic examination, and that the sample contained sperm. The parties disagree as to whether, in view of the affidavits submitted by the state in the trial court, the state exercised "reasonable diligence" in searching for the biological material that was recovered from the victim. The trial court apparently resolved that the biological material no longer exists on the basis of the state's memorandum in opposition to the application for DNA testing stating that the property no longer exists. See R.C. 2953.74(C)(1) (If a court concludes that the requested biological evidence no longer exists, it may not accept the application for DNA testing.).
 {¶ 13} As noted above, in February 2007, the state supplemented its response to defendant's application for DNA testing with affidavits describing the unsuccessful search for biological material collected in connection with this case. Specifically, the state submitted affidavits of two assistant prosecuting attorneys for Franklin County, the Crime Laboratory Manager of the Columbus Police Department Crime Laboratory, the property *Page 7 
room clerk for the Franklin County Prosecutor's Office, and the Senior Property Clerk for the Columbus Police Department.
 {¶ 14} The assistant prosecuting attorneys' affidavits state that a search of the property room of the Franklin County Prosecutor's Office was conducted in an attempt to locate property connected with State v.Carter, Franklin County Court of Common Pleas, case No. 86CR-1966. These affidavits also state that the prosecutors "personally inspected every piece of property not otherwise labeled as belonging to a different specific criminal prosecution." (See both Termuhlen and Bond affidavits.) The affidavit of the Senior Property Clerk for the Columbus Police Department states that, as of the most recent physical inventory on February 7, 2005, there was no property in the Columbus Police Department Property Room associated with the names of defendant or the victim in this case, and that no such property had been submitted to the property room since that date. The clerk for the Franklin County Prosecutor's Office averred that he was present for the assistant prosecutors' physical search of the property room, in which every piece of property not otherwise labeled as belonging to a different specific criminal prosecution was inspected. One of the assistant prosecutors also averred that he had a conversation with the Assistant Director of Clinical Laboratories at The Ohio State University Hospitals, Kevin Shively, that University Hospital East is the successor in interest to the former St. Anthony Hospital, and that Mr. Shively stated that no biological specimens at University Hospital East remain from the hospital's days as St. Anthony Hospital.
 {¶ 15} Defendant argues that the search for the collected biological material was insufficient. Defendant contends, inter alia, that the prosecutor should have searched *Page 8 
materials connected with the two other assailants allegedly involved in the rape, Lorenzo Logan and William Walker. The affidavits submitted by the state in the case at bar do not discuss whether the property room for the prosecuting attorney's office was searched for materials connected with any prosecution of the other assailants in this case.
 {¶ 16} It may be reasonable to conclude that evidence concerning the biological sample obtained from the victim in this matter may have been used in other prosecutions. A simple search of Ohio appellate cases reveals that a Lorenzo Logan was convicted of rape in 1986, in a case involving substantially similar evidence as found in this case. SeeState v. Logan (Apr. 28, 1988), Franklin App. No. 87AP-633 (affirming the defendant's convictions). In Logan, there was testimony that sperm was detected on a slide obtained from the victim's vaginal examination. See id.
 {¶ 17} However, regardless of whether or not the state's search was reasonably diligent, defendant is not entitled to postconviction DNA testing because an "exclusion result" from the DNA testing would not be "outcome-determinative."[1] Under R.C. 2953.74(B) and (C), a trial court may grant an application for DNA testing only if an "exclusion result" would be "outcome-determinative." As stated by the Supreme Court of Ohio in State v. Buehler, 113 Ohio St.3d 114, 2007-Ohio-1246, the statutory scheme concerning postconviction DNA testing "precludes a trial court from accepting an application for DNA testing unless an eligible inmate can show, in cases where the *Page 9 
inmate did not have DNA testing at trial, that an exclusion result would be outcome-determinative." Id. at ¶ 30.
 {¶ 18} For purposes of R.C. 2953.71 to 2953.83, an "exclusion result" is defined as an outcome of DNA testing that scientifically precludes or forecloses the applicant from being the contributor of the biological material recovered from the crime scene or crime victim. R.C.2953.71(G). Additionally, "outcome-determinative" means that had the results of DNA testing been presented at trial, there is a strong probability that no reasonable fact-finder would have found the inmate guilty. See R.C. 2953.71(L).
 {¶ 19} Defendant argues that an exclusion result would be outcome-determinative, because, according to him, he would have been acquitted had the result been presented at trial. Defendant contends that evidence that sperm was found on the victim after the alleged rapes provided the necessary corroboration to the victim's testimony that defendant vaginally raped her. Defendant further argues that the victim used the word "finished" synonymously with "ejaculated," and, therefore, the victim testified that defendant ejaculated while vaginally raping her. According to defendant, a result conclusively excluding defendant as the source of the sperm would undermine that testimony. Thus, it is defendant's position that an exclusion result would directly contradict the victim's testimony and seriously call into question her credibility.
 {¶ 20} The victim testified that all three men vaginally raped her. An exclusion result certainly would have precluded the jury from finding that the sperm found on the victim was that of defendant. However, such a result would not necessarily negate the victim's claim that defendant vaginally raped her, especially considering she also testified that the other two assailants vaginally raped her. If the sperm was not that of defendant, *Page 10 
then it reasonably could have been attributed to one of the other two assailants. Moreover, exactly what the victim meant by the word "finished" was not clear from her testimony, but it reasonably could have been viewed as specifying the point when defendant stopped raping her. Even if her testimony could be viewed as indicating that she believed defendant ejaculated, the jury, as the fact-finder, could have reasonably resolved that she was mistaken on that matter due to the trauma she endured and otherwise accepted her testimony that defendant, whom she knew, raped her.
 {¶ 21} Based on the foregoing, we find that a DNA test result excluding defendant as the source of the biological material collected from the vaginal area of the victim would not prevent a reasonable fact-finder from reaching a guilty verdict as to the rape charge. Because defendant cannot show that an exclusion result would be outcome-determinative, the pertinent statutory scheme precluded the trial court from accepting defendant's application for DNA testing. Therefore, we further conclude that the trial court did not err in denying defendant's application for postconviction DNA testing.
 {¶ 22} Accordingly, we overrule defendant's single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
SADLER, P.J., and BRYANT, J., concur.
[1] By journal entry filed after oral argument in this appeal, this court granted the parties leave to file supplemental briefs on the issue of whether, for purposes of R.C. 2953.74, a DNA test exclusion result regarding the biological material recovered from the victim would be outcome-determinative. *Page 1