[Cite as *State v. Scott*, 2025-Ohio-299.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-26 |
| | : | |
| v. | : | Trial Court Case No. 96-CR-0657 |
| | : | |
| JERMANE SCOTT | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 31, 2025

. . . . . . . . . . .

JERMANE SCOTT, Pro Se Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Jermane Scott appeals from the April 19, 2024 decision of the Clark County Common Pleas Court denying his application for postconviction DNA testing. For the following reasons, we will affirm the judgment of the trial court.

I.      Facts and Course of Proceedings

{¶ 2} Bertram Thomas was murdered in his home in December 1996. *State v. Scott*, 1998 WL 350878, *1 (2d Dist. July 2, 1998). Scott became a suspect "based on the statements of friends and acquaintances who had either been present at the time of the murder or had heard him talk about the murder, the fact that some of the victim's possessions were found at Scott's home, and Scott's use of the victim's checks and credit cards." *Id.* A grand jury indicted Scott on seven counts related to the death of Thomas: aggravated murder with prior calculation and design; aggravated murder committed in the course of an aggravated robbery; aggravated murder committed in the course of an aggravated burglary, aggravated robbery; aggravated burglary; misuse of a credit card; and forgery. *Id.* Scott was tried by a jury in September 1997 and was found guilty on all counts.

{¶ 3} After merging several of the offenses, the trial court sentenced Scott to life imprisonment without parole for aggravated murder, to three years of actual incarceration on a firearm specification, and to one year each for use of a credit card and forgery. Scott appealed from his convictions. *Id.* On direct appeal, Scott argued that his conviction was against the manifest weight of the evidence, the trial court had erred by allowing the State to call a witness to the stand that the State did not disclose in a timely manner, the trial court had erred when it refused to suppress Scott's videotaped statement to the Springfield Police Department, and the trial court had erred by refusing to sustain Scott's motion for a mistrial or a continuance when it became known that the

State failed to disclose statements made by a witness about his conversations with Scott in the days following the murder. We overruled all of Scott's arguments and affirmed the trial court's judgment. *Id.* at *2-6.

{¶ 4} On April 24, 2023, Scott filed an application for postconviction DNA testing pursuant to R.C. 2953.72. In his application, Scott identified the following evidence he wanted tested for DNA: "Human hairs found on the victim during autopsy . . . and one ceramic frog, plus cig butts." He stated that DNA evidence was collected, it was not used by the prosecution in his case, and it was found "on the victim/in stolen car of victim/next to victim." Scott argued DNA testing of these three items would have changed the outcome of his case by proving that there were alternative suspects and proving who the actual killer was. According to Scott, DNA testing of the human hairs would show that someone other than him killed the victim and stole the victim's car. Scott acknowledged that there were no co-defendants or other known suspects but noted that a Springfield Police Department detective had told him during an interview that Scott's fingerprints were found on the victim and that "some people" saw Scott get out of the victim's car. Scott believed a DNA test of the human hairs would prove that he had never been in the victim's house or car at any time in his life.

{¶ 5} On June 21, 2023, the trial court ordered the Clark County prosecutor to use reasonable diligence to determine (1) whether biological material was collected from the crime scene or victim of the offense for which the offender is an eligible offender and is requesting the DNA against which a sample from the offender can be compared and (2) whether the parent sample of that biological material still exists. On January 22, 2024,

the prosecutor described his efforts to locate any biological material relating to Scott's underlying trial. The prosecutor explained that he had not located any hair evidence and that the only biological material that may still be available for testing was a vial of the victim's blood. The prosecutor also stated that the victim's eyeglasses and clothing arguably may have DNA available for testing.

{¶ 6} On April 19, 2024, the trial court denied Scott's application for postconviction DNA testing, because the State did not possess any hair/fiber evidence and because the only biological material that was available for testing would not have been outcome determinative. Scott filed a timely notice of appeal from the trial court's April 19, 2024 decision.

II. The Trial Court Did Not Abuse Its Discretion When It Overruled Scott's Application for Postconviction DNA Testing

{¶ 7} Scott's sole assignment of error states:

The trial court erred in rejecting Appellant's application for post-conviction DNA testing.

{¶ 8} We review a trial court's decision to accept or reject an eligible inmate's application for postconviction DNA testing for an abuse of discretion. *State v. Nalls*, 2007-Ohio-1676, ¶ 18 (2d Dist.), citing R.C. 2953.74(A); *State v. Scott*, 2022-Ohio-4277, ¶ 10. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 2013-Ohio-966, ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 9} "Ohio law provides eligible offenders the opportunity to apply for postconviction DNA testing as described in R.C. 2953.71 through 2953.81." *Scott* at ¶ 6, citing R.C. 2953.73. The circumstances under which a trial court may accept an application for postconviction DNA testing are described in R.C. 2953.74. When Scott was tried for the murder of Thomas in 1997, DNA testing was not conducted on the items for which he has since requested testing. Consequently, Scott's application for postconviction DNA testing falls under R.C. 2953.74(B)(1).[1]

{¶ 10} A court may accept an R.C. 2953.73 application for postconviction DNA testing only if it determines that all six of the conditions in R.C. 2953.74(C) apply. The conditions include: (1) biological material was collected from "the crime scene or the victim" and the parent sample still exists; (2) there was sufficient parent material to extract a test sample; (3) the identity of the perpetrator was at issue at trial; (4) one or more of the defense theories asserted by the offender at the trial stage was of such a nature that, if DNA testing were conducted and an exclusion result were obtained, the exclusion result would be outcome determinative; (5) "if DNA testing is conducted and an exclusion result is obtained, the exclusion result would be outcome determinative regarding that offender";

_____

[1] As part of his application for postconviction DNA testing, Scott was required to show that, at the time of his 1997 trial, "DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available." R.C. 2953.73(B)(1). Failure to do so bars Scott from receiving DNA testing at this stage. *State v. Wilson*, 2024-Ohio-4712, ¶ 21 (2d Dist.). In his application, Scott stated that at the time of his trial "DNA testing was not highly accepted across the nation. Testing is being requested due to advancement in DNA technology that was not readily available at the trial stage." This statement was likely insufficient to meet the requirements of R.C. 2953.73(B)(1), especially given the fact that the Ohio Supreme Court addressed the reliability of DNA evidence in the early 1990s. *See State v. Pierce*, 64 Ohio St.3d 490 (1992). However, we need not resolve this issue because we are affirming the trial court's judgment on other grounds.

and (6) the parent sample and the extracted test sample are the same sample as collected and there is no reason to believe that they have been out of state custody or have been tampered with or contaminated since they were collected. R.C. 2953.74(C)(1)-(6).

{¶ 11} "Because the statutes do not prioritize the obligations imposed for considering an application for DNA testing, they vest considerable discretion and wide latitude with the judiciary upon the filing of such an application." *State v. Buehler*, 2007-Ohio-1246, ¶ 31. "For example, if a trial court decided that a DNA test exclusion result would not be outcome-determinative, the court would have no obligation to accept the application and would have no need for a prosecuting attorney to prepare and file a DNA evidence report pursuant to R.C. 2953.75." *Id.* "On the other hand, if the court knows or determines that DNA material had been collected from the crime scene but that the parent sample is no longer available for testing, that determination would moot the issue of whether the test result would be outcome-determinative." *Id.* "It is therefore apparent that a trial court should exercise its discretion in determining its best course of action when considering an application for DNA testing in an effort to best utilize judicial resources." *Id.*

{¶ 12} On September 4, 2024, the State filed its appellate brief and a notice of conceded error. In its response to Scott's assignment of error, the State explained that the trial court had not complied with R.C. 2953.76. According to the State, "The trial court, after learning that there may have been biological material available for testing, should have ordered the prosecutor to consult with a testing facility to determine the reliability of the samples." Appellee's Brief, p. 3. The State then explained that it had

submitted an inaccurate response to the trial court when it informed the trial court that it possessed a vial of the victim's blood. In fact, the State had been unable to locate any vial of the victim's blood. The State concluded, "Nevertheless, that information is not properly in the record before this Court, and as such, the case should be remanded for the record to be made that no parent sample is available for DNA comparison. This is also, in no way a concession that DNA testing is proper in this case. The record simply is incomplete, and therefore remand is the best possible avenue to correct the lacking record." *Id.*

{¶ 13} While we acknowledge the State's notice of conceded error, we cannot conclude on the record before us that the trial court abused its discretion when it denied Scott's application for postconviction DNA testing of human hair, a ceramic frog, and cigarette butts. Therefore, we will affirm the judgment of the trial court.

{¶ 14} On June 21, 2023, the trial court ordered the Clark County prosecutor to use reasonable diligence to determine (1) whether biological material was collected from the crime scene or victim of the offense for which the offender is an eligible offender and is requesting the DNA against which a sample from the offender can be compared and (2) whether the parent sample of that biological material still exists. In his application for postconviction DNA testing, Scott sought testing of human hair, cigarette butts, and a ceramic frog. However, the State was unable to locate any of these items for DNA testing.

{¶ 15} In the State's January 22, 2024 filing, the prosecutor explained that he had located and reviewed "the files from the Clark County Prosecutor's Office, the Springfield

Police Division and the Clark County Coroner's Office." According to the prosecutor, he reviewed the several thousand pages of documents in the more than three banker's boxes. In addition, the prosecutor reviewed any pieces of property that the Springfield Police Department had retrieved from the crime scene. The prosecutor also "met with the Clark County Sheriff's Department and had them pull all items of evidence admitted at trial." The prosecutor then explained his further efforts to locate the hair/fiber evidence that Scott referenced in his application:

> In an earlier filing, Mr. Scott included a picture of the hair/fiber that might be potential biological material. So I looked in general for biological material but also specifically for this alleged hair/fiber evidence. The potential evidence is included in a photo that contains a case number on a ruler. That case number appears to be A1280. That picture also contains [the] initials "RS".

> In examining the files the case number A1280 is assigned to the victim's autopsy report and the initials "RS" match that of Dr. Robert Stewart who performed the autopsy. In reading through Dr. Stewart's report, he includes a section titled DISPOSITION OF EVIDENCE AND LABORATORY SAMPLES, in this section Dr. Stewart does not indicate that any hair or fiber evidence has been collected. A vial of the victim's blood and tissue samples were collected.

> Officer Mike Beedy of the Springfield Police Division was assigned as a crime scene officer at the time of this incident and was present at the

autopsy and took possession of any items of evidence collected by Dr. Stewart. A review of the Property Receipt filed by Officer Beedy in this case shows that he logged 10 items of evidence as taken from the Autopsy. Of those ten items only one, the vial of the victim's blood, was biological in nature. It should be noted that no hair or fiber evidence was documented as being collected by Officer Beedy.

A review of the evidence submitted at trial showed two trial exhibits that were held in BIOHAZARD bags like the one in the picture with the alleged hair/fiber. One of these bags included the vial of the victim's blood and the other held glasses collected from the victim at the autopsy. No hair or fiber evidence was visible during inspection of these items.

Ultimately, the prosecutor concluded that "the only biological material that may still be available for testing is the vial of blood containing the victim's blood. The eye glasses and victim's clothes may also have blood on them that could be suitable for testing. I did not locate any hair or fiber evidence that would be available for testing."

{¶ 16} After considering the State's response, the trial court found that "there would be no value in testing the victim's blood. As for the victim's eyeglasses and clothing, no DNA was collected from those items." Decision (Apr. 19, 2024), p. 1. The trial court also noted that there was no hair or fiber evidence in the prosecutor's possession despite a photograph submitted with Scott's application that appeared to show hairs in a clear bag. The trial court then explained why DNA testing of the eyeglasses and clothing would not be outcome determinative.

{¶ 17} The record before the trial court established that the State did not possess any hair/fiber evidence on which to conduct DNA testing. Further, the State did not list a ceramic frog or cigarette butts as items that were available for testing. Therefore, the trial court did not abuse its discretion by denying Scott's application to conduct postconviction DNA testing of these three items. *Buehler*, 2007-Ohio-1246, at ¶ 31; *State v. Galloway*, 2008-Ohio-3470, ¶ 12 (10th Dist.) ("If the court concludes that the requested biological evidence no longer exists, it may not accept the application."). Moreover, there is no need to remand this matter solely for the State to develop a record that it cannot locate the vial of the victim's blood obtained during the autopsy, because Scott did not seek DNA testing of a vial of blood in his April 24, 2023 application for postconviction DNA testing. Similarly, there is no need for us to review the trial court's finding that DNA testing of the victim's vial of blood, eyeglasses, and clothes would not have been outcome determinative, because Scott did not seek testing of these items in the application that is before us.

{¶ 18} Finally, Scott argues that the State did not satisfy its obligation to search for the evidence identified in Scott's application for DNA testing and prepare a report. We disagree.

{¶ 19} The postconviction DNA testing statute requires that the State exercise reasonable diligence in determining whether the biological material subject to the offender's request for testing was collected from the crime scene or victim of the offense, and whether the same biological material exists at the time of the application for testing. R.C. 2953.75(A). In conducting this search, the prosecuting attorney is instructed to rely

upon all relevant sources, including, but not limited to, the following: (1) all prosecuting authorities from the original case, (2) all law enforcement authorities involved in the original investigation, (3) all custodial authorities involved at any time with the biological material in question, (4) the custodian of all these custodial agencies, (5) all crime laboratories involved at any time with the biological material in question, and (6) all other reasonable resources.   R.C. 2953.75(A)(1)-(6).

{¶ 20} The definition of "reasonable diligence" provided in the statute states: " 'Reasonable diligence' means a degree of diligence that is comparable to the diligence a reasonable person would employ in searching for information regarding an important matter in the person's own life."   R.C. 2953.71(Q).   "Ultimately, what constitutes reasonable diligence will depend on the facts and circumstances of each particular case." *State v. Carter*, 2007-Ohio-6858, ¶ 11 (10th Dist.), citing *State v. Ustaszewski*, 2006-Ohio-329, ¶ 23 (6th Dist.).   The prosecutor must address in a report filed with the trial court the existence and availability of the evidence and, if necessary, outline the State's efforts to locate the evidence if the evidence cannot be found.   R.C. 2953.75(B)

{¶ 21} As explained above, the State filed a response with the trial court setting forth its efforts to locate any biological evidence relating to Scott's convictions. According to the prosecutor, he reviewed thousands of pages of documents he had obtained from the prosecutor's office, the Springfield Police Division, and the coroner's office.   He also had the Springfield Police Division provide him with any physical evidence in its possession and met with the Clerk County Sheriff's Department to review all items of evidence admitted at trial.   Based on his meetings and review of all the

documents and items of evidence, the prosecutor concluded that the only biological materials that may still be available for testing were a vial of the victim's blood, the victim's eyeglasses, and the victim's clothes. Based on our review of the record, we conclude that the prosecutor exercised reasonable diligence in determining whether the biological material listed in Scott's application for postconviction DNA testing existed at the time of his application. Therefore, the trial court did not abuse its discretion in denying Scott's application to conduct DNA testing on hair, a ceramic frog, and cigarette butts that did not exist at the time he filed his application.

{¶ 22} Scott's sole assignment of error is overruled.


III.     Conclusion

{¶ 23} Having overruled Scott's assignment of error, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .


WELBAUM, J. and HUFFMAN, J., concur.