OPINION
{¶ 1} Appellant James Goins, Jr. has filed this appeal to challenge his conviction and prison sentence on charges of attempted aggravated murder, aggravated burglary, aggravated robbery, kidnapping, felonious assault, and receiving stolen property. Appellant was sentenced to 85 1/2 years in prison. Appellant argues that there were errors in the bindover proceedings from juvenile court, errors in the admission of expert evidence, and that the length of sentence constitutes cruel and unusual punishment. The record does not indicate that any reversible errors occurred, and the judgment of the Mahoning County Court of Common Pleas is affirmed.
 FACTS AND PROCEDURAL HISTORY {¶ 2} Appellant's conviction arose from events which occurred on January 29, 2001. Appellant, along with codefendant Chad Barnette, attacked William Sovak, age 84, as he was picking up his daily newspaper outside his home in Youngstown, Ohio. Appellant and Barnette were both juveniles at the time. They pushed Mr. Sovak back into his home, repeatedly hit and kicked him, and knocked him to the ground many times. During this melee, they hit Mr. Sovak on the head with his telephone, causing serious injury. They forced Mr. Sovak to his kitchen where they found a set of keys, which they took. They then pushed Mr. Sovak down the stairs to his basement, where he passed out. The assailants dragged Mr. Sovak to a fruit cellar storage room in the basement and locked the door so that he could not escape. Later that evening, a neighbor of Mr. Sovak telephoned Jerome Jablonski (the victim's half-brother) to report that there was blood all over Mr. Sovak's house. Mr. Jablonski and his brother went to the house and found a trail of blood from the front door to the basement. Mr. Jablonski broke the lock on the fruit cellar and found Mr. Sovak inside, who had sustained a punctured lung, broken ribs and other broken bones.
 {¶ 3} Also on January 29, 2001, Louis Luchisan, age 64, and his wife Elizabeth, were in their home in the same neighborhood as Mr. Sovak. Mr. Luchisan, who is confined to a wheelchair, had been working at his computer when two assailants kicked in the side door of his house. One of the men was carrying a firearm, which Mrs. Luchisan described as a sawed-off rifle or shotgun. The two assailants threatened to shoot the Luchisans if they did not give them some money. They hit Mr. Luchisan over the head with a plate, and Mrs. Luchisan saw blood flowing down her husband's head from the wound. Appellant and Barnette took Mrs. Luchisan to different rooms in the house looking for money. Mrs. Luchisan gave them about $167, while Mr. Luchisan gave them $20. Appellant and Barnette also hit Mrs. Luchisan with a telephone, and threatened to kill her. She eventually had to have staples put into her head as a result of the injuries.
 {¶ 4} Just before the attackers left, Mrs. Luchisan heard a car horn beeping, indicating that a third assailant was waiting outside. Appellant and Barnette took the keys to Mr. Luchisan's car, a blue Chevy Malibu. They stole the car and a 27-inch television from the Luchisan's home.
 {¶ 5} The police were notified to be on the lookout for the stolen vehicle. The car was spotted as the police were still inspecting the two crime scenes. Officer Joshua M. Kelly, who was on foot, saw the vehicle and pulled out his service firearm. The car suddenly veered and crashed into a tree. There were four people in the car, including Appellant in the front passenger seat. Officers also found a sawed-off rifle in the vehicle, similar in appearance to the weapon used at the Luchisan home. Appellant fled from the car after the crash, and was captured soon afterward.
 {¶ 6} Police found a blue denim jacket in Appellant's home. In the jacket pocket they found the keys to the Sovak's house. They also confiscated the clothing that Appellant was wearing when he was captured, and blood analysis was later performed on that clothing.
 {¶ 7} During the investigation the police photographed footprints left in the snow outside both Mr. Sovak's and Appellant's residences. The police also examined footprints from the Formica floor in Mr. Sovak's home, as well as a footprint left on the door of the Luchisans' house where it had been kicked in. The shoes of both Appellant and Barnette were seized by the police. The tread on those shoes was found to match shoe tread marks left at the crime scene.
 {¶ 8} On February 5, 2001, a juvenile delinquency complaint was filed against Appellant alleging twelve counts, including attempted murder, aggravated burglary, aggravated robbery, kidnapping, felonious assault, and receiving stolen property. The state filed a motion to transfer the case to the adult division of the Mahoning County Court of Common Pleas. On February 22, 2001, the court held a bindover hearing in which it found probable cause for all the offenses except for the kidnapping charges. The court held that the mandatory bindover provisions of R.C. § 2151.26
applied to the charges of attempted aggravated murder, the aggravated burglary of the Luchisans, the aggravated robbery of Mr. Luchisan, and the aggravated robbery of Mrs. Luchisan. The juvenile court then bound the entire case over to the Mahoning County Grand Jury.
 {¶ 9} On March 22, 2001, the Mahoning County Grand Jury indicted Appellant on the following charges: 1) attempted aggravated murder of Mr. Sovak; 2) aggravated burglary of Mr. Sovak; 3) aggravated robbery of Mr. Sovak; 4) kidnapping of Mr. Sovak; 5) aggravated burglary of the Luchisans; 6) aggravated robbery of Mr. Luchisan; 7) aggravated robbery of Mrs. Luchisan; 8) kidnapping of Mr. Luchisan; 9) kidnapping of Mrs. Luchisan; 10) felonious assault of Mr. Luchisan; 11) felonious assault of Mrs. Luchisan; 12) and receiving stolen property. Four of the counts contained gun specifications. The court consolidated the matter with the criminal case proceeding against codefendant Chad Barnette.
 {¶ 10} On November 28, 2001, Appellant and Barnette filed writs of habeas corpus with this Court, challenging whether the Mahoning County Court of Common Pleas, General Division, had jurisdiction over criminal charges that were not bound over from the juvenile division. Goins v.Wellington, 7th Dist. Nos. 01 CA 208, 01 CA 210, 2001-Ohio-3503 (Goins I). This Court denied both writs on December 18, 2001, and the case proceeded to jury trial beginning on March 4, 2002.
 {¶ 11} On March 12, 2002, the jury found Appellant guilty of all counts except for one count of felonious assault against Mr. Luchisan. The jury also found Appellant guilty of the gun specifications in counts six, seven, eight and nine.
 {¶ 12} A sentencing hearing was held on March 20, 2002. The trial court filed its judgment on March 21, 2002. The court sentenced Appellant to the maximum prison terms on each count, and to three years in prison on each gun specification. The court held that the kidnapping charges merged with robbery charges. The court also determined that all remaining sentences must be served consecutively to each other, for a total of 85 1/2 years in prison.
 ASSIGNMENT OF ERROR NO. 1 {¶ 13} "Appellant Was Denied Due Process of Law When He Was Tried as an Adult for Offenses for Which He Was Indicted That Were Never Bound over from the Juvenile Court to the General Division. (T.d. 40, 51, 55.) U.S. CONST., amend. XIV, OHIO CONST., art. I, §§ 1, 2, and 16."
 {¶ 14} Issue 1: Was there an improper bindover of the kidnapping charges?
 {¶ 15} Appellant raises two issues under this assignment of error. Appellant first argues that the general division of the Mahoning County Court of Common Pleas did not have jurisdiction to prosecute him on kidnapping charges that were not bound over from the juvenile division of the court. Appellee, in rebuttal, argues that this issue was previously decided by this Court in Goins v. Wellington (Dec. 18, 2001), 7th Dist. Nos. 01 CA 208, 01 CA 210 ("Goins I"). In Goins I, Appellant filed a writ of habeas corpus based, in part, on the failure of the juvenile court to find probable cause for the three kidnapping charges. This Court held that a habeas action was not the proper forum to litigate the issue as to whether the grand jury properly indicted Appellant for kidnapping, and left the matter undecided. Goins I at *5. Thus, Appellee is incorrect that this matter was previously reviewed and resolved in Goins I.
 {¶ 16} Appellee also argues that the Juvenile Court properly transferred jurisdiction of the entire juvenile case over to the general division, and that this act was sufficient for the general division to submit the case to the grand jury to determine the crimes for which Appellant would be indicted. Appellee is correct that, according to the language used by the juvenile court in its February 28, 2001, judgment entry, the court did submit the entire action over to the general division:
 {¶ 17} "IT IS THEREFORE ORDERED that pursuant to ORC 2151.26 (B), the matter herein is transferred to the General Trial Division of the Mahoning County Common Pleas Court for further proceedings pursuant to law."
 {¶ 18} In contrast, though, the judgment entry also states that the court, "makes no probable cause finding of Kidnaping [sic]" as set forth in counts 4, 8, and 9 of the juvenile complaint. This Court in Goins I
did offer an interpretation of the juvenile court judge's language when the court stated that it was not making a probable cause finding concerning the kidnapping counts:
 {¶ 19} "Rather than make a discretionary probable cause decision, the juvenile court actually made a statement of the law on kidnapping by saying that pushing a man into his house when he steps outside, dragging him around the house, and locking him in a fruit cellar is not kidnapping because it occurred on his own property where he was first found by the offenders. The court also decided that kidnapping is not committed when offenders drag a woman around the house in search of money and force her husband to stay in a room while the search was conducted. Because of the court's legal construction of the definition of kidnapping, these counts were not bound over." Id. at *5.
 {¶ 20} According to Appellant, the juvenile court retained exclusive jurisdiction over the kidnapping charges because it did not find probable cause to bind the charges over to the general division. Appellant argues that a juvenile court has exclusive jurisdiction over any child who is alleged to be a delinquent for committing acts that would constitute a felony if committed by an adult. See R.C. § 2151.23(A); former R.C. §2151.26(A), recodified as R.C. § 2152.12. Without a valid bindover, Appellant contends, the juvenile court retains exclusive jurisdiction over the charges and the child. Former R.C. § 2151.26(E); see also State v.Wilson (1995), 73 Ohio St.3d 40, 44, 652 N.E.2d 196.
 {¶ 21} The Ohio Supreme Court has made it clear that, absent a valid bindover procedure, a juvenile court retains exclusive jurisdiction over any case involving a delinquent child. See State v. Golphin (1998),81 Ohio St.3d 543, 544-545, 692 N.E.2d 608, and Wilson, supra, paragraph one of the syllabus.
 {¶ 22} The question Appellant presents is whether the general division of the court of common pleas properly acquired jurisdiction to try the kidnapping charges. Appellant argues that the juvenile court did not specifically bind over those charges and therefore, did not relinquish jurisdiction over those charges. This Court has recently resolved this issue in State v. White, 7th Dist. No. 01-JE-3, 2002-Ohio-5226. InWhite, the juvenile was charged with aggravated murder, including a death specification, and aggravated burglary. The juvenile court conducted a bindover hearing and found that there was probable cause on the aggravated murder charge. The juvenile court bound the case over to the general division of the Jefferson County Court of Common Pleas. The juvenile court did not specifically bind over the aggravated burglary charge. Id. at ¶ 35.
 {¶ 23} Soon afterward, defendant White was indicted on charges of aggravated murder, aggravated burglary, aggravated robbery, aggravated arson, tampering with evidence, escape, and assault. He later pleaded guilty to aggravated murder, aggravated burglary, aggravated robbery, and escape.
 {¶ 24} On appeal to this Court, the juvenile argued that he could not be convicted of aggravated burglary or aggravated robbery because those charges were not bound over from the juvenile court.
 {¶ 25} White cited former R.C. § 2151.23(H) to demonstrate that the general division of the court of common pleas could prosecute a juvenile for crimes that were not included in the bindover from juvenile court:
 {¶ 26} "If a child who is charged with an act that would be an offense if committed by an adult * * * is transferred for criminal prosecution * * *, the juvenile court does not have jurisdiction to hear or determine the case subsequent to the transfer. The court to which the case is transferred for criminal prosecution pursuant to that section has jurisdiction subsequent to the transfer to hear and determine the case in the same manner as if the case originally had been commenced in that court, including, but not limited to, jurisdiction to accept a plea of guilty * * * and to enter a judgment of conviction pursuant to the Rules of Criminal Procedure against the child for the commission of the offense that was the basis of the transfer of the case for criminal prosecution, whether the conviction is for the same degree or a lesser degree of the offense charged, for the commission of a lesser-included offense, or forthe commission of another offense that is different from the offensecharged. (Emphasis added.)" Id. at ¶ 37.
 {¶ 27} White held that under R.C. § 2151.23(H), a common pleas court may charge a juvenile with offenses that are different than those charged in juvenile court if the additional charges arise out of, or are derived from, the offense that was the basis of the transfer from juvenile court. Id. at ¶ 42. In White, this Court held that the aggravated murder charge that was the basis of the bindover included, as an essential element of the crime, that the crime occurred, "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery or robbery, [or] aggravated burglary[.]" Id. at ¶ 41; R.C. § 2903.01(B). This Court concluded that the crimes of aggravated robbery and aggravated burglary were derived from the aggravated murder charge that was bound over from juvenile court, and were permissible additional charges in the common pleas court proceedings. Id. at ¶ 46.
 {¶ 28} In prior years, once a juvenile was bound over to the general division of the court of common pleas, the juvenile court lost all jurisdiction to prosecute existing and future criminal charges against that juvenile:
 {¶ 29} "1. Once a juvenile is bound over in any county in Ohio pursuant to R.C. 2151.26 and Juv.R. 30, that juvenile is bound over for all felonies committed in other counties of this state, as well as for future felonies he may commit.
 {¶ 30} "2. When a minor is transferred from the Juvenile Court to the Court of Common Pleas on a charge which would constitute a felony if committed by an adult, the grand jury is empowered to return any indictment under the facts submitted to it and is not confined to returning indictments only on charges originally filed in the Juvenile Court." State v. Adams (1982), 69 Ohio St.2d 120, 23 O.O.3d 164,431 N.E.2d 326, paragraph one of the syllabus.
 {¶ 31} The Ohio legislature expressly repudiated at least part of theAdams holding in a subsequent revision to the juvenile bindover statutes in Am.Sub.H.B. No. 1, 146 Ohio Laws, Part I, effective January 1, 1996, and in subsequent revisions. The legislative notes to R.C. § 2151.011
state:
 {¶ 32} "1995 H 1, § 3, eff. 1-1-96, reads in part: (B) The General Assembly hereby declares that its purpose in enacting the language in division (B) of section 2151.011 and divisions (B) and (C) of section2151.26 of the Revised Code that exists on and after the effective date of this act is to overrule the holding in State v. Adams (1982),69 Ohio St. 2d 120, regarding the effect of binding a child over for trial as an adult."
 {¶ 33} It is not absolutely clear how much of the Adams opinion the legislature intended to overrule in its 1995 revisions. Many courts continue to apply the holding of paragraph two of the syllabus of Adams.
"The longstanding rule in Ohio is that upon transfer from juvenile court, the grand jury is authorized to return a proper indictment on the facts submitted to it, and is not confined to the charges originally filed in the juvenile court." State v. Walker (Sept. 28, 1999), 5th Dist. No. 99 CA 2, citing Adams, supra, paragraph two of the syllabus. "[T]he grand jury was within its power to indict appellant for counts that were not alleged in the juvenile proceedings." (Eleventh District Court of Appeals.) State v. Whisenant (1998), 127 Ohio App.3d 75, 81,711 N.E.2d 1016, fn. 4, citing Adams, paragraph two of the syllabus. "It is well established in Ohio jurisprudence that upon transfer from juvenile court, a grand jury is authorized to return a proper indictment on the facts submitted to it, and is not confined to the charges originally filed in the juvenile court." State v. Duncan (Sept. 12, 2001), 9th Dist. No. 3117-M, citing Adams, paragraph two of the syllabus. This Court, in dicta, also agreed that the 1996 changes to the juvenile bindover statutes were only meant to overrule paragraph one of the syllabus of Adams. See Goins I, at *5.
 {¶ 34} The version of R.C. § 2151.26 in effect at the time of the 2001 bindover hearing contained the following provisions:
 {¶ 35} "(F) Upon the transfer of a case for criminal prosecution to the appropriate court having jurisdiction of the offense under division (B) or (C) of this section, the juvenile court shall state the reasons for the transfer * * * The transfer abates the jurisdiction of thejuvenile court with respect to the delinquent acts alleged in thecomplaint, and, upon the transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred as described in division (H) of section 2151.23 of the Revised Code." (Emphasis added.)
 {¶ 36} R.C. § 2151.26(F) transfers jurisdiction with respect to "delinquent acts" and not merely with respect to the charges that were filed in juvenile court related to those delinquent acts. In the instant case, the juvenile court did not believe that the delinquent acts that occurred on January 29, 2001, established probable cause for the three kidnapping charges that were part of the juvenile complaint. Nevertheless, the juvenile court clearly transferred the entire case to general division of the Mahoning County Court of Common Pleas: "The Court having found probable cause that nine (9) felonies have been committed herein and that Count #1 is a Category one offense and Counts #6 and #7 are Category two offenses, IT IS THEREFORE ORDERED that pursuant to ORC2151.26 (B), the matter herein is transferred to the General Trial Division of the Mahoning County Common Pleas Court for further proceedings pursuant to law." (2/28/01 J.E.)
 {¶ 37} The kidnapping charges that were issued by the grand jury were based on the same delinquent acts under review in the juvenile court. The only difference between these charges is that the grand jury found that those acts charged in the delinquency process also formed the basis of three counts of kidnapping, whereas the juvenile court did not. The kidnapping charges were based on the events occurring on January 29, 2001, at the residences of Mr. Sovak and Mr. and Mrs. Luchisan, and do not involve any additional circumstances beyond those that were under review in the juvenile court. Therefore, the grand jury was free to indict Appellant on charges arising out of those circumstances, even though the juvenile court did not specifically transfer those charges when it bound the case over to the general division of the court of common pleas.
 {¶ 38} This same issue has recently been reviewed by this Court in the case of State v. Barnette, 7th Dist. No. 02 CA 65, 2004-Ohio-7211 (released on Dec. 28, 2004). In Barnette we also held that there was no error in the juvenile bindover proceedings relating to codefendant Chad Barnette.
 {¶ 39} Issue 2: Was the bindover invalid due to failure to conduct mental examination?
 {¶ 40} The second issue raised by Appellant alleges that the bindover proceedings were invalid because certain counts required the court to conduct a mental examination prior to binding the case over. R.C. § 2151.26
divides the bindover procedure into two categories: mandatory bindover charges and discretionary bindover charges. Appellant is correct that, pursuant to former R.C. § 2151.26(C)(1)(c), a mental examination was required prior to binding over certain discretionary charges. Goins I,
though, examined this same argument and held that there is an exception to R.C. § 2151.26(C)(1)(c):
 {¶ 41} "When one or more complaints are filed against a juvenile alleging two or more offenses, the court must first determine the existence of mandatory bindover counts. R.C. 2151.26(C)(4)(a). Then, the court can transfer remaining charges pursuant to its discretionary authority if: there is probable cause to believe the juvenile committed the act; the act would be a felony if committed by an adult; and the juvenile was at least fourteen. R.C. 2151.26(C)(4)(b). The statute specifically states that the court is not required to consider any other factor or conduct a mental examination. R.C. 2151.26(C)(4)(b)." Id. at *4.
 {¶ 42} The holding in Goins I, is now res judicata as to this issue. The doctrine of res judicata prevents parties from relitigating claims and issues when there is mutuality of the parties and when a final decision has been rendered on the merits. Grava v. Parkman Twp. (1995),73 Ohio St.3d 379, 653 N.E.2d 226, syllabus. Res judicata, in the form of either "issue preclusion" or "collateral estoppel," precludes the relitigation of matters in a subsequent proceeding between the parties to a prior action or those in privity with them. Whitehead v. Gen. Tel. Co.
(1969), 20 Ohio St.2d 108, 49 O.O.2d 435, 254 N.E.2d 10, paragraph one of the syllabus. Goins I constitutes a prior final order between the parties, namely, Appellant and the State of Ohio, represented by the office of the Mahoning County prosecuting attorney. Goins I, held that the absence of a mental examination did not invalidate the bindover proceedings. Appellant attempted to appeal Goins I to the Ohio Supreme Court, but the appeal was dismissed due to lack of prosecution. Goins v.Wellington (2002), 94 Ohio St.3d 1491, 763 N.E.2d 1188. Therefore, GoinsI constitutes a valid and binding final order, litigated by the same parties in a separate proceeding, that determines the matter being argued on appeal. Appellant cannot relitigate this issue in the instant appeal.
 {¶ 43} For all the reasons stated above, Appellant's first assignment of error is found to be without merit and is overruled.
 ASSIGNMENT OF ERROR NO. 2 {¶ 44} "Appellant Was Denied Due Process of Law When He Was Tried as an Adult Without a Proper Bindover from Juvenile Court."
 {¶ 45} This assignment of error presents a separate problem with the juvenile bindover proceedings than was argued in Appellant's first assignment of error. Appellant argues that that there are two types of bindovers from the juvenile court to the general division of the court of common pleas: mandatory bindover and discretionary bindover. Mandatory bindover is set forth in former R.C. § 2151.26(B), and includes the following types of charges:
 {¶ 46} "(B) After a complaint has been filed alleging that a child is a delinquent child for committing an act that would be an offense if committed by an adult, the court at a hearing shall transfer the case for criminal prosecution to the appropriate court having jurisdiction of the offense if the child was fourteen years of age or older at the time of the act charged, if there is probable cause to believe that the child committed the act charged, and if one or more of the following applies to the child or the act charged:
 {¶ 47} "* * *
 {¶ 48} "(4) The act charged is a category two offense, other than a violation of section 2905.01 of the Revised Code, the child was sixteen years of age or older at the time of the commission of the act charged, and either or both of the following apply to the child:
 {¶ 49} "* * *
 {¶ 50} "(b) The child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged."
 {¶ 51} Aggravated burglary and aggravated robbery were category two offenses in former R.C. § 2151.26(A), and would qualify for mandatory bindover if Appellant was alleged to have had a firearm or had control of a firearm during the crime, and either used the firearm to commit the crime or displayed, brandished or indicated possession of the firearm.
 {¶ 52} Appellant alleges that the juvenile court did not properly bind over the aggravated burglary and aggravated robbery counts because the gun specifications were not properly proven. Appellant cites State v.Hanning (2000), 89 Ohio St.3d 86, 728 N.E.2d 1059, in which the Ohio Supreme Court held that the mandatory bindover provisions of former R.C. § 2151.26(B)(4)(b) do not operate unless the delinquent child himself held or controlled the firearm and himself displayed, brandished or used the firearm in the commission of the crime. Id. at paragraph one of the syllabus. Appellant contends that the juvenile court also failed to follow the procedure for discretionary bindover, and therefore, the aggravated burglary and aggravated robbery charges were never bound over to the general division of the court of common pleas.
 {¶ 53} Appellant points to a single page of the trial transcript in which Mrs. Luchisan distinguished between a bigger defendant (presumably Chad Barnette) who had a gun, and smaller defendant (presumably Appellant) who did not have a gun. Appellant believes that this testimony nullifies the entire bindover proceedings with respect to the aggravated burglary and aggravated robbery charges.
 {¶ 54} Appellee, in contrast, argues that this issue cannot be challenged under the doctrine of res judicata. Appellee is correct. GoinsI held:
 {¶ 55} "The juveniles were alleged to have had a sawed-off rifle which they used to commit the burglary and the robbery. The [trial] court found that both juveniles threatened to shoot the Luchisans and both juveniles terrorized the Luchisans who were both struck in the head with the firearm. The allegation was that both personally controlled and used the firearm to facilitate the offense. The theory was not that one specifically identified juvenile controlled and used the firearm and the other watched. As such, there is no violation of the case law prohibiting mandatory bindover through R.C. 2151.26(B)(4)(b) based on an accomplice's use of a gun. See, e.g., * * * State v. Hanning (2000), 89 Ohio St.3d 86."Goins I at *3.
 {¶ 56} As explained earlier, the doctrine of res judicata prevents parties from relitigating claims and issues when there is mutuality of the parties and when a final decision has been rendered on the merits. Grava,
supra, 73 Ohio St.3d 379, 653 N.E.2d 226, syllabus. Res judicata, in the form of "issue preclusion" or "collateral estoppel," precludes the relitigation of matters in a subsequent proceeding between the parties to a prior action or those in privity with them. Whitehead, supra,20 Ohio St.2d 108, 49 O.O.2d 435, 254 N.E.2d 10, paragraph one of the syllabus. Res judicata applies in situations in which a defendant attempts to relitigate an issue in direct appeal that has already been litigated in a habeas proceeding. State ex rel. Rash v. Jackson,102 Ohio St.3d 145, 2004-Ohio-2053, 807 N.E.2d 344, ¶ 12. Res judicata also applies to bar relitigation of the issue of whether a court has proper subject matter jurisdiction over a case. Citicasters Co. v. Stop26-Riverbend, Inc., 147 Ohio App.3d 531, 2002-Ohio-2286, 771 N.E.2d 317, ¶ 33. "[W]here a person appears in an action for the purpose of contending that a judgment is void as a judgment against him, such person thereby submits to the court for its determination the question whether such judgment is or is not void as a judgment against him; and, if the court determines that such judgment is not void as a judgment against him, even though that determination is erroneous on the facts and on the law, the determination is res judicata between the parties and can only be attacked directly by an appeal therefrom." Claxton v. Simons (1963),174 Ohio St. 333, 337, 189 N.E.2d 62; see also Squires v. Squires
(1983), 12 Ohio App.3d 138, 141, 468 N.E.2d 73. The issue as to whether or not the gun specifications were properly relied upon in the bindover proceedings was litigated and decided in Appellee's favor in the habeas proceedings ruled upon in Goins I, and Appellant cannot relitigate the same issue in this appeal. Thus, Appellant's second assignment of error is without merit and is overruled.
 ASSIGNMENTS OF ERROR NOS. 3 AND 4 {¶ 57} "Appellant Was Denied Due Process of Law When `Scientific' Evidence Was Admitted Against Him Without Any Showing That the Evidence Was Truly Scientific Evidence.
 {¶ 58} "Appellant Was Denied Due Process and Confrontation When the Trial Court Permitted Dr. Maddox to Give Conclusions about DNA Tests Not Done by Him."
 {¶ 59} These two assignments of error are related and will be treated together, as they both deal with the admission of expert evidence submitted by the state. Appellant argues that the trial court should have held a preliminary hearing to disqualify three of the state's witnesses from presenting expert testimony. These witnesses presented evidence concerning shoe prints, blood samples, and DNA. Appellant points to Evid.R. 104(A), which states:
 {¶ 60} "Preliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court * * *. In making its determination it is not bound by the rules of evidence except those with respect to privileges."
 {¶ 61} Appellant also contends that the testimony provided by the three experts did not satisfy the requirements of Evid.R. 702, which states:
 {¶ 62} "A witness may testify as an expert if all of the following apply:
 {¶ 63} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 64} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 65} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 66} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 67} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 68} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 69} Appellant first argues that the trial court erred in failing to engage in a sua sponte examination of each of the state's expert witnesses to determine their qualifications as experts and whether their testimony was actually expert testimony. Appellant argues that the court is required to conduct a preliminary "gatekeeping" hearing to determine whether the expert testimony is based on methodology and reasoning that is scientifically valid. Appellant cites Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 589-590, 113 S.Ct. 2786,125 L.Ed.2d 469, in support. Daubert reviewed the admissibility of expert evidence under Fed.R.Evid. 702. Daubert rejected the prior standard for admissibility of expert testimony set forth in Frye v. United States
(C.A.D.C. 1923), 293 F. 1013, which excluded expert evidence solely because the theories or methodologies supporting the evidence were not generally accepted within a relevant scientific community. Daubert
relaxed the rather harsh Frye test, and established four nonexclusive factors for trial judges to use in determining the admissibility of expert evidence: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. Daubert at 593-594, 113 S.Ct. 2786,125 L.Ed.2d 469. The Ohio Supreme Court, in applying Daubert to our own rules of evidence, has held that the Daubert standard is flexible and that no single factor is determinative. State v. Hartman (2001),93 Ohio St.3d 274, 284, 754 N.E.2d 1150; Miller v. Bike Athletic Co.
(1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735.
 {¶ 70} Appellee argues that Ohio law does not require the trial judge to conduct a sua sponte hearing to determine whether proposed testimony is in fact admissible expert testimony. Appellee points out that Appellant cites no caselaw supporting a finding of reversible error simply because the trial court failed to sua sponte hold such a "gatekeeping" hearing. Appellee cites State v. Gott (June 28, 1990), 3rd Dist. No. 2-88-19, which held that, "[t]he Appellant was not denied his constitutional rights to a fair trial and due process of law because Ohio law does not require a pre-trial evidentiary hearing on the admissibility of controversial scientific testimony." Id. at *4. Appellee cites a number of cases which have held that the trial court is not required to hold a gatekeeping hearing, but rather, is merely required to assess
whether expert evidence meets the Daubert standard. See Miller, supra,80 Ohio St.3d at 611, 687 N.E.2d 735;
 {¶ 71} This Court itself has recently held that the Daubert analysis only applies if there has been a proper objection or proffer of evidence, and that a failure to object to the admission of expert evidence constitutes a waiver of any evidentiary errors pursuant to Evid.R. 103(A)(1). State v. Singh, 157 Ohio App.3d 603, 2004-Ohio-3213, appeal not allowed 103 Ohio St.3d 1525, 2004-Ohio-5852, 817 N.E.2d 409, ¶ 34. This Court held that:
 {¶ 72} "[T]he 1994 Staff Note to Evid.R. 702 states that the issues can typically be resolved by objection and decision during trial but that sometimes the issues may need to be heard in pretrial hearing where they were raised in a proffer. See State v. Scott (Sept. 21, 2001), 7th Dist. No. 98CA124, 2001-Ohio-3359, 2001 WL 1122072, at ¶ 13. In either case, the Staff Note does not contemplate a strict duty on the part of the trial court to ensure that the state meticulously explains the methodology of the scientist. Rather, it contemplates objection during trial or presentation in a proffer before trial." Id. at ¶ 35.
 {¶ 73} Because Appellant did not properly object at trial, his alleged error is subject only to the plain error rule. See Evid.R. 103(A)(1);State v. Baston (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128; Nilavarv. Osborn (2000), 137 Ohio App.3d 469, 491, 738 N.E.2d 1271; Statev. Blair (1990), 70 Ohio App.3d 774, 790, 592 N.E.2d 854. Crim.R. 52(B) provides that plain errors affecting substantial rights may be noticed although they were not brought to the attention of the court. Plain error only exists when the outcome of the trial clearly would have been different but for the error. State v. Stojetz (1999),84 Ohio St.3d 452, 455, 705 N.E.2d 329. The decision to correct plain error must be made with utmost caution under exceptional circumstances and only to prevent a manifest miscarriage of justice. Id. Crim.R. 52 allows a reviewing court to take corrective action, but it does not require such action. Based on the record before us, the exceptional circumstances contemplated by Crim.R. 52 do not exist in this case.
 {¶ 74} Appellant did not object to the testimony of Donna Rose, an expert from the Ohio Bureau of Criminal Investigation and Identification (BCI). Appellant now takes issue with Ms. Rose's statement that her identification of footprints was nothing more than what any member of the jury might do on his or her own:
 {¶ 75} "Q Is there something that you can do to identify those prints that I can't do or the jury can't do?
 {¶ 76} "A Not really." (Tr., p. 927.)
 {¶ 77} Appellant contends that Ms. Rose should not have been permitted to testify as an expert if her analysis was no better than that of a layperson. Appellant apparently considers this testimony to conflict with Evid.R. 702(A), which states that an expert may only testify if, "[t]he witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons[.]"
 {¶ 78} Appellee argues that Ms. Rose's overall testimony indicates that she had specialized knowledge and experience enabling her to distinguish differences in shoeprints. Appellee contends that Ms. Rose's expert training enabled her to distinguish details that would exclude a particular shoe from being a match with a particular shoeprint. The record supports Appellee's argument. Ms. Rose may have been overly modest when she stated that her identification skills were no different than what the jury could do on their own. First, Ms. Rose was trained in footwear impression analysis, was employed in the Trace Evidence Unit of BCI, belonged to two professional organizations of forensic scientists, had testified as an expert in 20 counties in Ohio, and had performed approximately 500 identifications just in the 10 months prior the trial in the instant case.
 {¶ 79} Second, Ms. Rose had a systematic approach to shoeprint analysis that started with identifying general characteristics, and then focused on specific unique elements of the shoe and the shoeprint to either exclude the shoe or to identify an exact match. (Tr., pp. 898-899.)
 {¶ 80} Third, Ms. Rose's testimony revealed information that the general public would not have had, as indicated by her statement that a footprint can rarely be narrowed down to a specific shoe. (Tr., p. 898.)
 {¶ 81} Fourth, Ms. Rose knew what to expect in the tread patterns, and knew what specific parts of the shoeprint were necessary to match the shoe and the shoeprint. (Tr., p. 901.)
 {¶ 82} Fifth, Ms. Rose knew what parts of shoe pattern would show up in test impression (creating a shoeprint on a blank piece of paper) versus what would appear in a footprint made in snow. (Tr., p. 921.)
 {¶ 83} It is clear that Ms. Rose had extensive experience in analyzing shoeprints and that this experience permeated her entire testimony. (Tr., p. 914.) Thus, it was not plain error for Ms. Rose to testify as an expert in shoeprint comparison.
 {¶ 84} Appellant also complains of the testimony of Dale Laux, a serologist from BCI. Once again, Appellant did not object to Mr. Laux's testimony. Appellant now contends that Mr. Laux failed to explain the specific test he used to determine that a substance suspected to be blood is actually blood. Appellant is presumably arguing that Mr. Laux's testimony violated Evid.R. 702(C), which requires an expert to use reliable methods and principles as the basis of his or her conclusions.
 {¶ 85} Appellee argues that is irrelevant whether Mr. Laux explained the details of his preliminary test to determine whether there was blood on state's exhibits 58 and 59, because Mr. Laux conducted a more specific test confirming that the substance was actually human blood. Appellee is correct in this argument. Mr. Laux explained in detail how the second test was conducted. (Tr., p. 1147.) Even if there was error in the way Mr. Laux explained the procedure for the preliminary test for blood, the second test (which is not being challenged on appeal) also determined that the substance was blood, and more importantly, that it was human blood. Since the second test confirmed and essentially duplicated the first test, any error in the admission of the results of the first test was harmless.
 {¶ 86} Finally, Appellant complains of the admission of the testimony of Dr. Louis Maddox regarding DNA testing. Specifically, Appellant challenges whether Dr. Maddox proved that DNA testing had a basis in the laws of nature. Appellant believes that DNA is scientifically inaccurate and suspect, citing at length McDonald, Juries and Crime Labs: Correcting the Weak Links in the DNA Chain (1998), 24 American Journal of Law and Medicine 345. This article does not support Appellant's position. In fact, the article begins with a general acceptance of DNA evidence: "After a decade of courtroom battles and heated academic debate, the United States has entered an age where the scientific validity of deoxyribonucleic acid (DNA) evidence is not subject to serious dispute." Id. at 345. Furthermore, the article proposes, "new * * * standards for the admissibility of DNA evidence." Id. As Appellant is well aware, one of the criteria for the admissibility of expert evidence under Daubert is whether the methodology has gained general acceptance in the scientific community. It is unclear how the trial court could have committed plain error by failing to recognize what appears to be Appellant's novel theories about DNA evidence, as contained in the article cited above.
 {¶ 87} Furthermore, as Appellee points out, the Ohio Supreme Court has ruled that DNA test results are admissible evidence, and questions about the reliability of the tests are left for the jury to decide:
 {¶ 88} "We hold that questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility. No pretrial evidentiary hearing is necessary to determine the reliability of the DNA evidence. The trier of fact, the judge or jury, can determine whether DNA evidence is reliable based on the expert testimony and other evidence presented." State v. Pierce (1992),64 Ohio St.3d 490, 501, 597 N.E.2d 107.
 {¶ 89} Finally, as Appellee notes, Appellant cannot show that he was prejudiced by the alleged error because of the substantial independent evidence of his guilt apart from the DNA tests. Appellant was identified by one of the victims, had similar footprints to those found at the crime scenes, was wearing similar clothes to those identified by the victims, had human blood on his clothes, had Mr. Sovak's keys in a jacket found in Appellant's bedroom, and was identified as he fled from the stolen vehicle. As explained above, plain error can be found only if the outcome of the trial clearly would have been different absent the error. For these reasons, Appellant's third assignment of error is overruled.
 {¶ 90} In assignment of error number 4, Appellant presents a very vague objection to Dr. Maddox's testimony on the theory that certain unspecified information and tables were not produced at trial, purportedly related to DNA evidence. Appellant contends that the trial court's failure to address this problem violates his right to confront witnesses as set forth in the Sixth Amendment and Section 10, Article I, Ohio Constitution. It is almost impossible to address this assignment of error without some clue from Appellant concerning the specific part of Dr. Maddox's testimony that is being challenged, or some reference to the particular charts, tables, or background information that should or should not have been relied upon. Nevertheless, we will try to make some sense of Appellant's argument. Appellant has also failed to assert or show that trial counsel objected to the alleged evidentiary error during trial, and therefore, this assignment of error is also subject only to the plain error rule.
 {¶ 91} Appellant cites at length from the case of State v. Robles
(1989), 65 Ohio App.3d 104, 583 N.E.2d 318, to support his argument. InRobles, the Sixth District Court of Appeals reversed a murder conviction based upon an error in the testimony of the state's blood and serology expert. The state's expert testified that he examined samples of blood from the victim, the defendants, and from various pieces of evidence in the case. Id. at 108, 583 N.E.2d 318. One of those items of evidence was a brown Ford Torino automobile that was discovered while in the possession of one of the defendants. The expert opined that blood found in the automobile was not from the defendants. He went on to testify that it was statistically likely that the blood came from the victim. He based his conclusion, in part, on a 1982 study done by the FBI containing population frequency data of blood samples. Defense counsel objected to the expert's opinion based on the fact that the 1982 study was not in evidence, and that reliance on the study violated the rules governing hearsay evidence. When the state attempted to introduce a summary of the study into evidence, counsel objected that it was outdated information.
 {¶ 92} The Sixth District found reversible error because: 1) Evid.R. 703 requires an expert to base his opinion on personal knowledge or on facts in evidence; 2) the FBI data was not in evidence at the time the expert gave his opinion; 3) the summary of the FBI report that was belatedly entered into evidence was not properly authenticated; and 4) the error was prejudicial because the jury could not have rendered its guilty verdict without the expert's opinion testimony. Id. at 109-111,583 N.E.2d 318.
 {¶ 93} Appellee contends, in rebuttal, that R.C. §§ 2317.36 and 2317.38
allow an expert's report to be admitted into evidence without the necessity of also producing all the supporting documentation that went into the report. R.C. § 2317.36 states:
 {¶ 94} "A written report or finding of facts prepared by an expert who is not a party to the cause, nor an employee of a party, except for the purpose of making such report or finding, nor financially interested in the result of the controversy, and containing the conclusions resulting wholly or partly from written information furnished by the co-operation of several persons acting for a common purpose, shall, in so far as the same is relevant, be admissible when testified to by the person, or one of the persons, making such report or finding without calling as witnesses the persons furnishing the information, and without producing the books or other writings on which the report or finding is based, if, in the opinion of the court, no substantial injustice will be done the opposite party."
 {¶ 95} R.C. § 2317.38 contains five prerequisites to the admission of an expert report as described in R.C. § 2317.36: 1) notice must be given; 2) that notice must be delivered a reasonable time before trial; 3) a copy of the report must be given; 4) the opposing party must have a reasonable time to inspect and copy the records upon which the report is based; and 5) the names of all persons furnishing facts upon which the report is based must be provided. Appellee contends, and the record reflects, that it met all the requirements of R.C. § 2317.38, allowing for the proper introduction of the DNA report from Cellmark Labs. The record also shows that Dr. Maddox was employed by Cellmark Labs and helped to produce the report. Appellee contends that Dr. Maddox based his opinion about the blood evidence on the DNA report, and that no further supporting documentation was necessary.
 {¶ 96} Appellant's arguments are not persuasive. Appellant relies almost exclusively on the Robles case, even though that case can be distinguished in many ways from the case now under review. First, as previously noted, the defendants in Robles properly objected during trial, whereas Appellant's counsel failed to object to Dr. Maddox's testimony on the grounds presented in this assignment of error.
 {¶ 97} Second, Dr. Maddox based his opinion on DNA test results that were properly introduced into evidence during his testimony. (Tr., p. 1096.)
 {¶ 98} Third, Dr. Maddox did not rely on outdated FBI population studies to form his opinion. Dr. Maddox did mention, as background information, that the FBI standardized the testing of 13 specific regions of DNA as part of DNA identity analysis, and that all labs use those same FBI standards. (Tr., pp. 1077-1078.) The Ohio Supreme Court has held that an expert witness does not have to document this type of background information:
 {¶ 99} "There are certain things that an expert, by reason of his expertise, knows. * * * When providing background information, and not opining as to causation, we cannot expect an expert to footnote every statement with a recitation of his direct observation of the phenomenon, or a bibliography explaining how he knows his statement to be true."Wightman v. Consolidated Rail Corp. (1999), 86 Ohio St.3d 431, 437,715 N.E.2d 546.
 {¶ 100} Fourth, the Robles case did not consider the impact of R.C. §§2317.36 and 2317.38 on the expert testimony under review. The record reveals that the state followed the requirements for admitting DNA evidence under those statutes.
 {¶ 101} Fifth and finally, there is substantial evidence apart from the testimony of Dr. Maddox that established Appellant's guilt. InRobles, there was no evidence to establish the defendant's guilt other than the problematic expert testimony.
 {¶ 102} Based on all these factors, it cannot be said that the outcome of the trial clearly would have been different had the alleged error not occurred. In fact, it appears from the record that no error occurred. Appellant's fourth assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. 5 {¶ 103} "Appellant Was Denied the Ability to Remain Free from Cruel and Unusual Punishments When the Trial Court Imposed Maximum Consecutive Sentences. (T.d. 43, 44.) U.S. CONST., amend. VIII and XIV; OHIO CONST., art. I, § 9."
 {¶ 104} Appellant argues that the trial judge arbitrarily decided that Appellant and his codefendant Chad Barnette would be sentenced to a prison term equal to the age of the oldest victim, Mr. Sovak, who was 84 years old when the crimes occurred. The trial judge stated at the sentencing hearing: "it's my intention, gentlemen, to give you at least one year in jail for every year of the life of the man who you tried to kill and these other people who you terrorized * * *." (Mar. 20, 2002 Tr., p. 44.) Appellant was then sentenced to an aggregate term of 85 1/2 years in prison on all counts. Appellant contends that the trial court's basis for imposing sentence would shock the conscience of the average person or a person who understands the purposes and liabilities of felony sentencing.
 {¶ 105} Appellee asserts that a prison sentence that falls within the statutory ranges set by the legislature cannot amount to cruel and unusual punishment, citing McDougle v. Maxwell (1964), 1 Ohio St.2d 68, 69,203 N.E.2d 334; see also State v. Evans, 153 Ohio App.3d 226,2003-Ohio-3475, 792 N.E.2d 757. Appellee points out that Appellant has not cited any comparative examples to demonstrate that the sentence was shocking in the sense of being grossly disproportionate to sentences in similar cases. For a criminal penalty to violate the Eighth Amendment, the penalty must be, "so disproportionate to the offense as to shock the moral sense of the community." McDougle at 69, 203 N.E.2d 334. Without something more than counsel's unsupported assertion that the maximum consecutive sentence in this case was shocking and outrageous, the sentence will be upheld as being within the guidelines set by the legislature.
 {¶ 106} Appellant's counsel raised an additional sentencing issue at oral argument that relates to the United States Supreme Court case ofBlakely v. Washington (2004), 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403, and a very recent case reaffirming Blakely, namely, U.S. v. Booker
(2005), ___ U.S. ___, 125 S.Ct. 25, ___ L.Ed.2d ___. Blakely reviewed the constitutionality of the felony sentencing guidelines of the State of Washington. Blakely held that part of Washington's felony sentencing scheme violated the Sixth Amendment right to jury trial because it allowed the trial judge to impose an exceptional sentence based on facts that were neither admitted by the defendant nor found by a jury. Appellant argues that Blakely renders Ohio's felony sentencing as unconstitutional because it permits a judge to impose a sentence based on factors that were not determined by the jury. Appellant asserts that the holdings in Blakely effectively prohibit the trial court from sentencing him to anything other than the minimum possible sentence under Ohio law, because only the minimum sentence can be supported by the facts determined by the jury.
 {¶ 107} This same argument was raised as part of codefendant Chad Barnette's direct appeal, and it was our conclusion in Barnette that the issue was waived for purposes of direct appeal because counsel did not object at trial to an alleged violation of the constitutional right to a jury trial. Barnette, supra, 7th Dist. No. 02 CA 65, 2004-Ohio-7211, ¶ 102; see, e.g., State v. Awan (1986), 22 Ohio St.3d 120, 123, 22 OBR 199, 489 N.E.2d 277. The issues that were under review in Blakely had been previously reviewed by the United States Supreme Court and by many other state and federal court decisions. Blakely is part of a line of cases stemming from the seminal case of Apprendi v. New Jersey (2000),530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. In Apprendi, the defendant pleaded guilty to firearm possession charges as part of a plea agreement. During sentencing, the trial court determined that the crime was committed with the purpose to intimidate because of race in violation of New Jersey's hate-crime statute. The finding by the trial court elevated the penalty from a maximum of 10 years to a period of 10 to 20 years.
 {¶ 108} Apprendi held that "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348, 147 L.Ed.2d 435; see alsoRing v. Arizona (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556;Harris v. U.S. (2002), 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524. {¶109} The argument that Appellant is now attempting to assert under the authority of Blakely is essentially the same argument raised inApprendi. The Apprendi case was decided on June 26, 2000, long before Appellant was convicted and sentenced for the crimes under review in this appeal. The constitutionality of Ohio's sentencing scheme certainly could have, and should have, been raised during the trial court proceedings.Blakely dealt with well-established constitutional rights, which must be timely raised at trial in order to be preserved as issues on appeal. We are not in the habit of allowing the parties to raise additional arguments in the eleventh hour on appeal that could have been raised at trial or within the time limits set forth in the Rules of Appellate Procedure for filing briefs and submitting assignments of error for review.
 {¶ 110} We also concluded in Barnette that Ohio's felony sentencing scheme does not appear to violate the holdings in Apprendi and Blakely.Blakely stands for the proposition that, under the Sixth Amendment, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Blakely, 124 S.Ct. at 2536, 159 L.Ed.2d 403. InBlakely, the "statutory maximum" is not the longest term the defendant can receive under any circumstances, but rather, is "the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant." Id. at 2537, 159 L.Ed.2d 403.
 {¶ 111} In Ohio, the trial judge does not have the discretion to impose a sentence beyond what is prescribed for each crime that is listed in the indictment, taking into account any specifications that are also listed in the indictment. For example, Appellant was charged and convicted of two counts of aggravated burglary, in violation of R.C. §2911.11(A)(1). This crime is designated as a first degree felony, which is punishable by three to ten years in prison. R.C. § 2929.14(A)(1). Once a jury makes the findings that establish that the crime of aggravated burglary has been committed, the trial court has no discretionary power to impose a punishment beyond the statutory maximum for a first degree felony. Unlike the statutes at issue in Blakely, Ohio does not provide statutory exceptions that would allow the trial court to exceed the maximum punishment allowed by the aggravated burglary statute. A number of Ohio court's have come to this same conclusion. State v. Scheer, 4th Dist. No. 03CA21, 2004-Ohio-4792; State v. Sour, 2nd Dist. No. 11913, 2004-Ohio-4048; State v. Bell, 1st Dist. No. C030726, 2004-Ohio-3621; but see contra, State v. Bruce, 1st Dist. No. C-040421, 2005-Ohio-373. We conclude here, as we did in Barnette, that Appellant has waived this issue for review, and even if it had been timely raised, Ohio's sentencing scheme does not violate the Sixth Amendment.
 {¶ 112} Also in keeping with our recent Barnette decision, we must acknowledge that plain errors did occur during sentencing, although those errors were not in the nature of the Sixth and Eighth Amendment violations discussed above. We determined that Chad Barnette was convicted of the crimes of receiving stolen property and aggravated robbery, both involving the same stolen property. Barnette at ¶ 52. As we pointed out in Barnette, "`It is hornbook law that a thief cannot be charged with committing two offenses — that is, stealing and receiving the goods he has stolen. E.g., Cartwright v. United States, 146 F.2d 133;State v. Tindall, 213 S.C. 484, 50 S.E.2d 188; see 2 Wharton, Criminal Law and Procedure, Section 576; 136 A.L.R. 1087. And this is so for the commonsensical, if not obvious, reason that a man who takes property does not at the same time give himself the property he has taken. In short, taking and receiving, as a contemporaneous — indeed a coincidental-phenomenon, constitute one transaction in life and, therefore, not two transactions in law. * * *' State v. Wilson (2001),145 Ohio App.3d 374, 378, 763 N.E.2d 196, quoting Maumee v. Geiger
(1976), 45 Ohio St.2d 238, 74 O.O.2d 380, 344 N.E.2d 133." Barnette at ¶ 49.
 {¶ 113} It has been the consistent and longstanding rule in Ohio that a defendant cannot be sentenced for both a theft crime and a receiving stolen property crime based on the same stolen property. Thus, the trial court should not have imposed an additional 18-month sentence on the receiving stolen property conviction.
 {¶ 114} We also found in Barnette that the trial court had failed to make the required findings to justify imposing the maximum prison sentence for the aggravated robbery of Mr. Sovak. Pursuant to R.C. §2929.14(C), a trial court must make at least one of four possible findings to justify imposing a maximum sentence. One of the four possible findings is that the offender committed the worst form of the offense. The trial court must also give reasons to support its findings. R.C. §2929.19(B)(2)(d). According to the sentencing hearing transcript, the trial court based its imposition of maximum prison terms on its conclusion that Appellant and Barnette committed the worst form of each offense. Although the trial court recited a list of crimes that were the worst form of the offense, the court did not include the aggravated robbery of Mr. Sovak in its recitation. (3/20/02 Tr., p. 43.) As we noted in the reconsideration of Barnette:
 {¶ 115} "If the trial court's intent is clear, it is not required to list, by rote, each count along with each finding and each supporting reason. In the instant case, however, the trial court did specifically list each count that the court relied on in reaching its conclusion that the actions of Appellant constituted the worst form of the offense. Absent from this very specific list is one count of aggravated robbery. The trial court did not express its over-arching intent in a shorthand form, but rather, chose to enunciate each count by rote. Normally, when we encounter such a rote listing, we must apply the interpretive canon of expressio unius est exclusio alterius, which means that, `the expression of one thing implies the exclusion of the other.' In re Miamisburg TrainDerailment Litigation (1993), 92 Ohio App.3d 304, 309, 635 N.E.2d 46. Once the trial court decided to list each count separately in expressing its intent, we can only interpret this to necessarily exclude any count not on the list." State v. Barnette, 7th Dist. No. 02 CA 65, 2005-Ohio-477, ¶ 6.
 {¶ 116} In Barnette we concluded that the sentencing errors warranted a modification of the sentence. We determined that Appellant's prison term for receiving stolen property should be served concurrently with the remaining sentences. We also concluded that Appellant's prison sentence for the aggravated robbery charge should be reduced to three years instead of the maximum of the ten years imposed by the trial court. We now hold that the same result should apply to Appellant, who was jointly tried and sentenced for the same crimes as codefendant Barnette. Our analysis is more fully revealed in our Barnette Opinion, and in the reconsideration of that Opinion cited above. In keeping with Barnette, we partially sustain Appellant's fifth assignment of error with respect to the aforementioned sentencing errors.
 ASSIGNMENT OF ERROR NO. 6 {¶ 117} "Appellant Was Denied the Effective Assistance of Counsel When His Trial Counsel Failed to File a Motion to Suppress Evidence and a Motion to Challenge Scientific Evidence. U.S. CONST., amend. VI and XIV; OHIO CONST., art. I, §§ 1, 2, 10, and 16."
 {¶ 118} In this assignment of error, Appellant sets forth two very minimal arguments attempting to establish that his counsel should have filed a motion to suppress and a motion to challenge scientific evidence, and that the failure to file the motions constitutes ineffective assistance of counsel.
 {¶ 119} The Sixth Amendment of the United State Constitution, and Section 10, Article I, Ohio Constitution, guarantee not only the right of a criminal defendant to counsel, but also a right to the effectiveness of that counsel. See Gideon v. Wainwright (1962), 372 U.S. 335, 83 S.Ct. 792,9 L.Ed.2d 799; Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373. To establish ineffective assistance of counsel, Appellant must demonstrate that counsel's performance fell below an objective standard of reasonable competence, and that he was prejudiced by counsel's errors. Strickland at 687-688. Prejudice will not be found unless Appellant demonstrates that there is a reasonable possibility that, if not for counsel's errors, the result of the trial would have been different. Id.; Bradley at 143, 538 N.E.2d 373.
 {¶ 120} A properly licensed attorney is presumed to be competent.State v. Smith (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128. The tactics that counsel employs during trial are strongly presumed to fall within the wide range of reasonable professional assistance. Bradley at 138, 538 N.E.2d 373. "[T]he burden of proving ineffectiveness is on the defendant." State v. Smith (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128.
 {¶ 121} Appellant first asserts that his counsel should have filed a motion to suppress because there was no probable cause to arrest him. This argument is not supported with any reference to the record, or any cogent legal argument.
 {¶ 122} The fact that an attorney does not file a motion to suppress is not, in and of itself, proof of ineffective assistance of counsel.State v. Lester (1998), 126 Ohio App.3d 1, 6, 709 N.E.2d 853. There are circumstances, though, in which failure to file a motion to suppress could constitute ineffective assistance of counsel. If reasonably competent counsel would have filed a motion to suppress, and if there is a reasonable probability that filing the motion would have been granted and would have changed the outcome of the case, then failure to file the motion would be considered as ineffective assistance of counsel. SeeState v. Lott (1990), 51 Ohio St.3d 160, 174-175, 555 N.E.2d 293.
 {¶ 123} "[A] motion to suppress challenges the use of evidence before trial on the basis that the evidence was illegally obtained in violation of a constitutional right." State v. Gabel (1991), 75 Ohio App.3d 675,676, 600 N.E.2d 394. In this assignment of error, Appellant has alleged that unspecified evidence was the, "fruit of the poisonous tree," because Appellant's arrest was illegal. Appellant, though, has not pointed out any plausible constitutional violation surrounding his arrest. The constitutional prohibition against unreasonable searches and seizures is not violated when an officer performs a warrantless arrest if there is probable cause to believe that a person has committed or is committing a felony. State v. Heston (1972), 29 Ohio St.2d 152, 155-156, 58 O.O.2d 349,280 N.E.2d 376. The record reveals that the Youngstown Police were notified about a stolen vehicle and that they saw Appellant flee from the stolen vehicle after it crashed into a tree. (Tr., pp. 760, 764, 795-797.) Sergeant Kenneth Linden and another officer apprehended Appellant after a brief chase. (Tr., pp. 798-799.) The record, therefore, supplies ample justification for Appellant's initial arrest.
 {¶ 124} In the second part of this assignment of error, Appellant simply asserts, without further analysis, that counsel was ineffective for failing to request a pretrial ruling on the reliability of the state's scientific evidence, presumably meaning the DNA evidence. Obviously, DNA evidence has been used in criminal prosecutions for many years. See, e.g., Pierce, supra, 64 Ohio St.3d 490, 597 N.E.2d 107. Appellant does not point to any fact or legal theory that would have prevented the state from offering its DNA evidence, even if there had been a pretrial hearing to review that evidence. A pretrial hearing may have only alerted the prosecutor to defense counsel's trial strategy, and may have allowed the state to bolster its DNA evidence with further documentation. If defense counsel had no legitimate reason for challenging the DNA evidence, it would appear to be an acceptable trial strategy to forego a pretrial hearing and simply challenge the evidence on cross-examination, which is what occurred. For all the abovementioned reasons, Appellant's sixth assignment of error is overruled.
 {¶ 125} In conclusion, there is no merit to Appellant's first, second, third, fourth and sixth assignments of error. We partially sustain Appellant's fifth assignment of error. We modify Appellant's 18-month prison sentence on the charge of receiving stolen property (count twelve in the indictment) so that it will run concurrently with the sentences for the remaining counts. We also reduce Appellant's prison sentence on the charge of aggravated robbery (count three in the indictment) to three years in prison, to run concurrently with the sentences on the remaining counts. Appellant's total prison sentence is now an aggregate of 74 years in prison. We affirm all remaining aspects of Appellant's conviction and sentence in the Mahoning County Court of Common Pleas.
Donofrio, P.J., concurs.
Vukovich, J., concurs.